Naomi WATSON, Plaintiff,

v.

**MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY and Gloria Watson, Defendants.**

Civ. No. 80–623.

United States District Court, D. New Jersey.

April 17, 1980.

Martin & Hart by Derrick N. Hart, East Orange, N. J., for plaintiff.

Helen R. Cassidy, Brooklyn, N. Y. by Martin B. Schnabel, Brooklyn, N. Y., for defendant Manhattan and Bronx Surface Transit Operating Authority.

Emil H. Philibosian, Middlebush, N. J. by Richard C. Spooner, New York City, for defendant Gloria Watson.

## OPINION

BIUNNO, District Judge.

The facts before the court are relatively simple and straightforward. One James Watson, a New York resident and citizen, was a bus driver for defendant Manhattan and Bronx Surface Transit Operating Authority (MaBSTOA), a public benefit corporation created under § 1203-a of the New York Public Authorities Law.

Under a collective bargaining agreement between MaBSTOA and the Transport Workers Union of America, Mr. Watson was a participant in a "presumed" retirement benefit plan, also called a "death gamble", this being a right afforded to New York City governmental employees by sec. B 3–36.0(4) of the Administrative Code of the City of New York. As explained in the papers, the collective bargaining agreement makes these benefits applicable to MaBSTOA employees as though they were city governmental employees rather than employees of a corporate authority.

As described, the benefit provides that where an employee has accumulated vested pension rights for retirement, but elects to continue in employment rather than retiring, then if he dies while so employed he is "presumed" to have retired on the day before his death. This presumption evidently entitles his named beneficiary (or his estate if the beneficiary predeceases) to the actuarial equivalent on a present value basis of the pension payments that would have accrued had he so retired and survived for his theoretical life expectancy.

The parties are evidently in agreement that this lump sum or present value benefit amounts to some $112,000. as of the day before Mr. Watson's death on August 22, 1979.

The affidavit for MaBSTOA carries a photocopy of Mr. Watson's notarized designation of his wife, the defendant Gloria Watson, as beneficiary. It is dated October 5, 1972.

While in Washington, D.C., it is alleged that Mr. Watson took ill on August 18, 1979, was admitted to the District of Columbia General Hospital, and died August 22, 1979.

From argument at the hearing, it appears that Mr. Watson's remains were prepared for burial by an undertaker in Washington, transported to New York for funeral services, and buried in Morris County, N.J.

Plaintiff is decedent's sister, a resident and citizen of New York. MaBSTOA is a

governmental authority of the State of New York and is necessarily a citizen of that State. Defendant's widow, Gloria Watson, is a resident and citizen of Washington, D.C.

Although delicately phrased, the theme of the complaint implies that the widow caused decedent's death by "foul play." It alleges that plaintiff had been decedent's named beneficiary for 17 years, that the family did not learn of decedent's marriage or of the 1972 change of beneficiary until the time of the funeral, and that undue influence was exerted over decedent by defendant Gloria Watson to induce the change of designation of beneficiary.

When the complaint was filed, plaintiff sought and obtained an order to show cause for preliminary injunction to restrain MaB-STOA from disbursing the benefit sum. The order was issued March 6, 1980 and was returnable March 24, 1980. All parties appeared by counsel.

Both defendants challenged the jurisdiction of the court, which the complaint claimed under both 28 U.S.C. § 1331 (federal question) and § 1332 (diversity). One of the defendants produced a photocopy of the D.C. hospital records, just obtained, and this was ordered filed with a copy provided to plaintiff. Plaintiff asked for a continuance to allow time for the records to be reviewed by a medical consultant. Defendants objected that this would require a further court appearance. The court resolved this problem by directing that defendants need not appear on the adjourned date, and that no ruling adverse to them would be made without providing an opportunity to respond in writing to plaintiff's further argument on the adjourned date, with a copy of the transcript thereof to be provided to them.

On the adjourned date plaintiff had not obtained the medical expert's review, and the matter was carried again to April 11, 1980, when plaintiff's further argument was heard. The points that follow were discussed at the hearing, though not in the order stated here.

■ 1. *Service of process.* It appeared that no summons had been issued or served on either defendant. Thus, the time for answer under F.R.Civ.P. 12 has not begun to run. Both defendants had received the complaint and order to show cause, along with the supporting papers, but no summons. In the New Jersey courts, certain actions may be processed in a summary manner under N.J. Court Rule R.4:67, by complaint and order to show cause but without summons. An order to answer is added to the order to show cause, and no summons is issued, N.J. Court Rule R.4:67–3.

This is a highly efficient procedure by which cases involving only minor factual disputes and largely turning on questions of law can be decided promptly, expeditiously and inexpensively. Unlike the traditional motion for summary judgment, the court is allowed to hear and resolve minor factual issues and then decide the case. When it appears that the dispute is of greater magnitude than this, the action is converted from a summary proceeding to a plenary action, N.J. Court Rule R.4:67–5.

There is no parallel procedure in the federal courts. By Act of Congress,

"All writs and process issuing from a court of the United States shall be under the seal of the court and signed by the clerk thereof". 28 U.S.C. § 1691.

While orders to show cause are authorized by F.R.Civ.P. 65 for the limited purposes of securing temporary restraints or to bring on applications for preliminary injunction, they do not substitute for the summons which is to be issued and served together with the complaint under F.R.Civ.P. 4.

Orders to show cause are merely procedural equivalents to motions allowed to be brought, by leave, on short notice. They are not (except where specially authorized as under N.J. Court Rule R.4:67) either original process or substitutes for it. At the hearing on their return, the burden of persuasion must be carried by the party who secured the order, despite the somewhat misleading name which incorrectly implies that the party haled in by the order must carry the burden.

In any event, the question is not substantive, but adjective and procedural. If jurisdiction be under 28 U.S.C. § 1331 or similar statute, federal procedure applies. If jurisdiction be under 28 U.S.C. § 1332, on diversity grounds, federal procedure applies under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, including *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Thus, in any case, the procedures set out by N.J. Court Rule R.4:67 cannot be applied here no matter how desirable and effective they would be.

2. *Jurisdiction under 28 U.S.C. § 1332 (diversity).* Since plaintiff and defendant MaBSTOA are both citizens of New York, complete diversity is lacking, and there can be no jurisdiction under this section. The point is long settled and needs no citation.

■ 3. *Jurisdiction under 28 U.S.C. § 1331 (federal question).* At the argument of April 11, 1980, plaintiff suggested that a cause of action arises under federal law by virtue of 16 U.S.C. § 457. That statute provides that:

> "In the case of the death of any person by the neglect or wrongful act of another within a * * * place subject to the exclusive jurisdiction of the United States, *within the exterior boundaries of any State*, such right of action shall exist as though the place were under the jurisdiction of the State *within whose exterior boundaries such place may be * * * "* (emphasis added).

It was argued that since death occurred in the District of Columbia, the statute created a federal "wrongful death" action (i. e., a Lord Campbell's Act) coming within 28 U.S.C. § 1331.

The court cannot agree. The District of Columbia is the "seat of government", over which the Congress exercises exclusive jurisdiction by virtue of *U.S.Const.*, Art. I, sec. 8, cl. 17. The District was originally established pursuant to the Maryland Act of 1788, and the Virginia Act of 1789, to cede to the Congress tracts not exceeding 10 miles square, and the federal Act of July 16, 1790 (1 Stat. 130) which accepted these ces-

sions and established the seat of government. Thus, the District of Columbia is *not* "within the exterior boundaries of any State", and the provisions of 16 U.S.C. § 457 do not apply.

4. *Jurisdiction under 28 U.S.C. § 1335 (interpleader).* The MaBSTOA submissions disclose that it is a mere stakeholder, without interest in the competing claims of Naomi Watson and Gloria Watson. See, also, 28 U.S.C. § 2361 for process and procedure, 28 U.S.C. § 1397 for venue requirements, and F.R.Civ.P. 22 for what is called "non-statutory" interpleader to supplement the statutory provisions.

■ MaBSTOA has not filed here for interpleader. If it did, it could not meet the venue requirement of 28 U.S.C. § 1397 since such actions must be brought in the judicial district "in which one or more of the claimants reside". For such an action, the citizenship of the stakeholder is irrelevant to the jurisdictional question, because 28 U.S.C. § 1335 only requires that there be diversity of citizenship between *claimants*. But, since neither claimant resides in this district, an interpleader suit by MaBSTOA could not be filed here.

If there were jurisdiction here on the complaint as it stands, it may be that MaBSTOA would be obliged to file a compulsory counterclaim for interpleader under F.R. Civ.P. 13(a), or allowed to file a permissive counterclaim under F.R.Civ.P. 13(b). If the *civil action represented by the complaint* can be "brought" in this district in the venue sense, then a counterclaim for interpleader could be asserted even though the venue would not be proper if the interpleader were brought as an independent "civil action". This is so because venue provisions deal with where the action is "brought", and once an action is properly "brought" in a district, the compulsory or permissive counterclaims may be asserted *in that action*. See 6 Wright & Miller, Federal Practice and Procedure, Civil §§ 1416, 1424; *Wearly v. FTC*, 462 F.Supp. 589 (D.N.J., 1978), rev'd on other grounds, 616 F.2d 662 (CA 3, 1980).

Thus the action, as it stands, is a sort of attempt at a "reverse interpleader"; it asserts a claim by one claimant and, if there were jurisdiction and venue as the case stands now, could conceivably compel or induce a counterclaim and cross-claim for interpleader. See, e. g., *Tumarkin v. Friedman*, 17 N.J.Super. 20, 85 A.2d 304 (App. 1951), cert. den. 9 N.J. 287, 88 A.2d 39 (1952).

This result cannot be achieved, however, unless this court has jurisdiction and venue over the claim as it stands. Absent that, the hoped for interpleader cannot be compelled or induced.

■ 5. *Disinterment and autopsy jurisdiction.* From the papers and argument at both hearings, it appears that the reason for selection of this district for suit is that the remains of James Watson are buried in Morris County in this district, and that plaintiffs seek to have his remains disinterred, an autopsy performed, and thereby hopefully obtain evidence to support the contention or suspicion that his death was caused by defendant Gloria Watson by means of foul play.

Thus, the main motive for this suit is to obtain evidence to support the claim to the death benefits. The hospital records disclose that no autopsy was performed there. It is claimed that defendant Gloria Watson withheld consent for an autopsy. At argument, it was asserted that this was in compliance with decedent's wish, expressed while alive.

Whatever the facts in these regards may be, the authority to order the disinterment of a dead body, and the conduct of an autopsy to ascertain the cause of death (beyond what is already reflected in the hospital records and death certificate) appear to be subjects not within the jurisdiction of a federal court, even when there is a civil action pending, with jurisdiction over the subject-matter and parties and with proper venue, in which the disinterment and autopsy are involved only indirectly and for the purpose of obtaining evidence which may (or may not) support the merits of the claim.

■ Just as the federal courts have no jurisdiction to probate a will or administer an estate, *Markham v. Allen*, 326 U.S. 490, 66 S.Ct. 296, 90 L.Ed. 256 (1946), or to grant divorces, alimony or custody, *Barber v. Barber*, 62 U.S. 582, 21 How. 582, 16 L.Ed. 226 (1858); *Ex parte Burrus*, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890), so it appears that they have no subject-matter jurisdiction over the disinterment of dead bodies or the conduct of autopsies. No precedent has been shown or found.

These subjects, like the others mentioned, are evidently matters reserved exclusively to the States. State statutes dealing with disinterment and autopsies, such as N.J.S.A. 40A:9–50, are part of the administrative machinery of the states whereby local authorities must be advised of every death caused by violence, casualty, suicide, or of a sudden death without apparent cause or occurring in some suspicious or unusual manner.

Except, perhaps, for the military, the federal government has no agencies or officials charged with the function of establishing original records of birth, marriage, divorce, annulment, death or other matters of vital statistics. Those matters are entirely governed by state law and attended to by state officials and agencies. Such information of this kind as may appear in federal records, such as those of the Social Security Administration, the Immigration and Naturalization Service, and others, are *secondary* sources which rely on certifications of records maintained by State or foreign law, with the possible exception of the Missing Persons Act, formerly 50 U.S.C.App. § 1001, et seq., now 5 U.S.C. § 5561 et seq. and 37 U.S.C. § 551, et seq.

■ By local law in New Jersey, once a body is buried, it is in the custody of the law, and the statutes on disinterment and autopsy are intended for public purposes only and for the protection of public health, welfare and safety. They provide no basis to secure evidence to support or defend private claims. See *Petition of Sheffield Farms Co.*, 22 N.J. 548, 126 A.2d 886 (1956). See, also, N.J.S.A. 26:6–37 (1965).

## CONCLUSION

For the reasons stated, the court concludes that there is no jurisdiction here under § 1331, § 1332 or § 1335 of Title 28, USC, no jurisdiction by reason 16 U.S.C. § 457, and no jurisdiction to order disinterment and autopsy. F.R.Civ.P. 12(h)(3).

Suit against the MaBSTOA can be filed in New York, where both plaintiff and the Authority are. Once a claim is asserted in a court having jurisdiction, that fact may induce MaBSTOA to interplead the conflicting claimants who can then conduct the litigation. Whether or not disinterment of the remains, and autopsy, can be obtained to secure evidence, is a matter for the New Jersey courts and not for any federal court.