693 A.2d 457

JOANNE WINGATE AND SALVATORE ERIC PIRRI, A MINOR, BY HIS GUARDIAN AND NATURAL MOTHER, JOANNE WINGATE, PLAINTIFFS–APPELLANTS, v. ESTATE OF JOHN J. RYAN AND HELEN THOMAS, ADMINISTRATRIX OF THE ESTATE OF JOHN J. RYAN, DEFENDANTS–RESPONDENTS.

Argued February 4, 1997—Decided May 19, 1997.

*Charles H. Jones, IV*, argued the cause for appellants (*Gravino, Vittese & Jones*, attorneys).

*George G. Rosenberger, Jr.*, argued the cause for respondents (*Butler, Butler & Rosenberger*, attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

The issue raised in this appeal is whether the twenty-three-year limitations period found in *N.J.S.A.* 9:17–45(b) of the New Jersey Parentage Act ("Parentage Act"), codified at *N.J.S.A.* 9:17–38 to – 59, applies to an intestacy action filed by a thirty-one-year-old claimant to prove parentage and heirship under *N.J.S.A.* 3B:5–10 of the Administration of Estates—Decedents and Others Act. That statute, commonly referred to as the Probate Code, is codified at *N.J.S.A.* 3B:1–1 to 3B:29–1. In 1991, the Legislature amended section 5–10 of the Probate Code to provide that a parent and child relationship "may be established as provided by the 'New Jersey Parentage Act,'" by persons born out of wedlock for purposes of proving heirship. *L.* 1991, *c.* 22, § 1.

Plaintiff Joanne Wingate filed a complaint under the Probate Code to establish that she and her son are heirs of John L. Ryan. The trial court denied defendants' motion for summary judgment to dismiss plaintiff's complaint for failure to file the claim by her twenty-third birthday. On defendants' appeal, the Appellate Division reversed in a published opinion, holding that the twenty-three-year limitations period in the Parentage Act, *N.J.S.A.* 9:17–45(b), applied to plaintiff's claim. 290 *N.J.Super.* 463, 676 *A.*2d 144 (1996). We granted plaintiff's petition for certification, 146 *N.J.* 496, 683 *A.*2d 199(1996), and now reverse. We hold that the limitations period under the Parentage Act does not apply to claims filed under the Probate Code.

I

Plaintiff Joanne Wingate was born on December 15, 1963. Plaintiff's mother, Rachel M. Parsio, was married to Willard Wingate at the time of plaintiff's birth. Parsio and Willard Wingate were divorced in 1970. Willard Wingate died in 1988. On February 6, 1995, decedent John J. Ryan died intestate. Until just before Ryan's death, plaintiff had believed that she was Willard Wingate's natural child. However, ten days before Ryan's

death, plaintiff's mother informed her that Ryan was her natural father.

Decedent had a close relationship with Parsio and plaintiff. Parsio asserts that decedent purchased gifts for plaintiff on holidays and birthdays, and paid for substantial expenses, such as her braces and her wedding gown. According to Parsio, decedent acknowledged to her that he was plaintiff's biological father on several occasions, but decedent repeatedly refused to publicly acknowledge that fact because he and Parsio were not married, and such a revelation would cause embarrassment, particularly in light of his Catholic faith. Parsio claims that she did not reveal decedent's paternity because Ryan threatened to "cut off ties," including financial support, to her and plaintiff.

After filing her complaint on February 7, 1995, in the Chancery Division, Family Part, plaintiff obtained an order permitting blood and hair samples to be taken from decedent prior to embalming. Cellmark Diagnostics performed genetic testing on samples from decedent, Parsio, and plaintiff.

Cellmark's DNA fingerprint analysis revealed a match between decedent and plaintiff, the probability of which was one in twenty-three million for unrelated persons. DNA blood profiles revealed a 99.99% probability of decedent's paternity, as compared to that of a random Caucasian male. Cellmark's report concluded that decedent was plaintiff's natural father, and decedent's estate has not contested that conclusion.

Plaintiff filed an amended complaint on February 17, 1995, adding Helen Thomas, both individually as decedent's sister and as administratrix of decedent's estate, as a defendant. Defendants then filed a motion for summary judgment. The Family Part granted summary judgment to defendants dismissing the complaint, reasoning that plaintiff had failed to comply with the twenty-three-year limitations period under the Parentage Act, N.J.S.A. 9:17–45(b).

On plaintiff's motion for reconsideration, the Family Part vacated its summary judgment and transferred the matter to the Probate Part. The Appellate Division granted defendants' motion for leave to appeal and stayed further proceedings in the Probate Part pending disposition of the appeal. The Appellate Division reversed the trial court's denial of defendants' motion for summary judgment.

## II

### -A-

Our analysis must begin with the legislative enactments that will inform our ultimate decision. The Wills, Descent and Simultaneous Death Act was enacted in 1977 and amended in 1979. The predecessor to the provision that is pertinent to this case provided:

> If, for purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person.
>
> a. The relationships and rights of an adopted minor child shall be those as provided by section 14 of P.L.1977, c. 367 (C. 9:3–50), and the relationships and rights of an adopted adult shall be as provided in N.J.S. 2A:22–3.
>
> b. In cases not covered by a., a person born out of wedlock is a child of the mother. That person is also a child of the father, if:
>
> (1) The natural parents, before or after the birth of the child, participated in a ceremonial marriage or shall have consummated a common-law marriage where such marriage is recognized as valid in the manner authorized by the law of the place where such marriage took place, even though the attempted marriage is void; or
>
> (2) The paternity is established by an adjudication before the death of the father or is established thereafter by clear and convincing proof, except that the paternity established under this subparagraph is ineffective to qualify the father or his kindred to inherit from or through the child unless the father has openly treated the child as his, and has not refused to support the child.
>
> [*N.J.S.A.* 3A:2A–41.]

In 1982, the Legislature revised the Wills, Descent and Simultaneous Death Act and renamed it an Act for the Administration of Estates—Decedents and Others, now commonly known as the Probate Code. *L.* 1981, *c.* 405. Pertinent to this case is *N.J.S.A.*

3B:5–10, which repealed *N.J.S.A.* 3A:2A–41 and became effective in 1982. The 1982 version of *N.J.S.A.* 3B:5–10 provided:

> If, for the purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through or from a person, a child born out of wedlock is a child of the mother. That child is also a child of the father, if:
>
> a. The natural parents, before or after the birth of the child, participated in a ceremonial marriage or shall have consummated a common-law marriage where the marriage is recognized as valid in the manner authorized by the law of the place where the marriage took place, even though the attempted marriage is void; or
>
> b. The paternity is established by an adjudication before the death of the father or is established thereafter by clear and convincing proof, except that the paternity established under this subsection is ineffective to qualify the father or his kindred to inherit from or through the child unless the father has openly treated the child as his, and has not refused to support the child.

*N.J.S.A.* 3B:23–19 of the Probate Code provides a general limitations period for claims brought under that statute. Claims by persons whose names or addresses are unknown must be brought "within a reasonable time and after reasonable notice ... as may be prescribed by the court." *N.J.S.A.* 3B:23–19. *N.J.S.A.* 3B:23–20 provides that a person who fails to file a claim within the time required by the court pursuant to *N.J.S.A.* 3B:23–19 "shall be forever thereafter debarred from all right, title or claim to the decedent's estate."

The 1982 version of *N.J.S.A.* 3B:5–10(b) is identical to a provision in the Uniform Probate Code of 1969. *Unif. Probate Code* § 2–109(2)(ii), 8 *U.L.A.* 67 (1983). That section has alternative provisions, one for jurisdictions that have adopted the Uniform Parentage Act, and the other, followed by New Jersey, for those jurisdictions that have not adopted the Uniform Parentage Act. *Id.* at 67–68 cmt. Thus, when the Probate Code was modified in 1982, New Jersey had not yet adopted a Parentage Act. That, however, was changed the next year, creating inconsistent methods and standards of proof for establishing parentage under New Jersey's Probate Code and Parentage Act.

-B-

In 1983, the Legislature passed the Parentage Act, which is modeled after the Uniform Parentage Act of 1973. *Assembly Judiciary, Law, Public Safety and Defense Committee Statement to Senate Bill No. 888—L.* 1983, c. 17. The Legislature enacted the Parentage Act "to establish the principle that regardless of the marital status of the parents, all children and parents have equal rights with respect to each other and to provide a procedure to establish parentage in disputed cases." *Ibid.*

Procedurally, the Parentage Act establishes several presumptions of paternity in *N.J.S.A.* 9:17–43(a), and sets forth in section 43(d) the burden of proving paternity absent the existence of such a presumption. Claims to establish paternity must be filed timely: "[n]o action shall be brought under this act more than 5 years after the child attains the age of majority." *N.J.S.A.* 9:17–45(b). That section effectively imposes a twenty-three-year statute of repose for actions under the Parentage Act, running from the child's date of birth.

*N.J.S.A.* 9:17–45(b) is analogous to a provision of the Uniform Parentage Act that requires an action to be brought within three years of a child's majority. *Unif. Parentage Act* § 7, 9B *U.L.A.* 306 (1987). The comment to that Uniform Parentage Act section states that, "[i]n effect, . . . this Section provides for a twenty-one-year statute of limitations, except that a late paternity action does not affect laws relating to distribution and closing of decedents' estates or to the determination of heirship." *Ibid.* cmt. Because the Probate Code and the Parentage Act prior to 1991 provided different methods and standards for establishing parentage, steps were taken to resolve the conflicts.

-C-

The responsibility for attempting to reconcile the conflicting methods and standards of proof in the two acts fell on the New Jersey Law Revision Commission ("Commission"). *N.J.S.A.*

1:12A–8. In its 1987 annual report to the Legislature pursuant to *N.J.S.A.* 1:12A–9, the Commission reported that the methods and standards for proving parentage under the Probate Code and the Parentage Act were inconsistent. *First Annual Report of the New Jersey Law Revision Commission* 3 (1987) (*"Law Revision Commission Report"*). The focus of the report was limited to the inconsistent burdens of proof required by those two statutes. *Ibid.* The Commission noted that the Parentage Act specified several presumptions of paternity that could be rebutted by clear and convincing evidence. *Ibid.* If no presumption of parentage existed, then that issue would be determined by a preponderance of the evidence. *N.J.S.A.* 9:17–43(d). The Probate Code, on the other hand, required claimants to prove paternity by clear and convincing evidence for post-mortem claims under the 1982 version of *N.J.S.A.* 3B:5–10(b).

The Commission explained that "the version of the [Uniform] Probate Code chosen for *N.J.S.* 3B:5–10 was never intended to be enacted in jurisdictions which accepted the [Uniform] Parentage Act," and that the Legislature had enacted the version of the Uniform Probate Code provision that reflected the absence of a Parentage Act in New Jersey at that time. *Law Revision Commission Report, supra,* at 3–4. The Commission recommended that the Legislature amend the Probate Code to reflect New Jersey's adoption of the Uniform Parentage Act in 1983, and to allow children born out of wedlock to prove paternity for heirship purposes by using the more permissive standards of the Parentage Act. *Id.* at 4. The Commission stated that such an amendment would promote "the modern principle that the parent-child relationship extends equally, irrespective of the marital state of the parents." *Ibid.*

Consistent with the Commission's recommendation, in 1991 the Legislature revised *N.J.S.A.* 3B:5–10 to provide:

> If, for the purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person, in cases not covered by N.J.S. 3B:5–9, [for adoption,] a person is the child of the person's parents regardless of the marital state of the person's parents, and the parent and

child relationship may be established as provided by the "New Jersey Parentage Act," P.L.1983, c. 17 (C. 9:17–38 et seq.).

[*L.* 1991, *c.* 22, § 1 (effective Feb. 19, 1991) (codified at *N.J.S.A.* 3B:5–10).]

The parties agree that in view of the 1991 amendment, plaintiff must follow the methods and standards of proof outlined in the Parentage Act. They also agree that the DNA test results establish that John Ryan is plaintiff's father. The parties disagree, however, on whether plaintiff's claim against the estate is time barred.

## III

### -A-

Plaintiff argues that the Probate Code's statute of limitations, *N.J.S.A.* 3B:23–19, applies to her claim. That section provides that "the court may require all those persons whose names or addresses are unknown, to appear or file their [intestacy] claims ... within a reasonable time and after reasonable notice by publication or otherwise, as may be prescribed by the court." *Ibid.* Plaintiff contends that the 1991 amendment to the Probate Code was intended to incorporate only the favorable methods and standards of proof found in the Parentage Act without altering the limitations period for filing her claim under *N.J.S.A.* 3B:23–19.

Defendants argue that the Appellate Division was correct in applying the limitations provision of the Parentage Act, *N.J.S.A.* 9:17–45(b), because it is more specific and was enacted more recently than *N.J.S.A.* 3B:23–19. 290 *N.J.Super.* at 471, 676 *A.*2d 144 (citing 3A Norman J. Singer, *Sutherland on Statutory Construction,* § 70.03 (5th ed. 1992) ("When two or more statutes of limitation deal with the same subject matter, the statute which is more recent and specific will prevail over the older and more general one.")).

The critical question is whether the Legislature intended in 1991 to change the Probate Code's statute of limitations, *N.J.S.A.* 3B:23–19. To answer that question, we must interpret the amend-

ment. We have consistently held that when interpreting a statute, "courts must seek to fulfill the statutory objective 'so far as the terms of the legislation and proper consideration of the interests of those subject to it will fairly permit.'" *State v. Haliski,* 140 *N.J.* 1, 9, 656 *A.*2d 1246 (1995) (quoting *State v. Gill,* 47 *N.J.* 441, 444, 221 *A.*2d 521 (1966)); *Merin v. Maglaki,* 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992). A court should interpret a statute in a way that advances "the sense and meaning fairly deducible from the context." *Lesniak v. Budzash,* 133 *N.J.* 1, 14, 626 *A.*2d 1073 (1993).

 The first consideration when interpreting a statute is the statute's plain meaning. *State v. Szemple,* 135 *N.J.* 406, 421, 640 *A.*2d 817 (1994); *Merin, supra,* 126 *N.J.* at 434, 599 *A.*2d 1256; *Town of Morristown v. Woman's Club,* 124 *N.J.* 605, 610, 592 *A.*2d 216 (1991). If different interpretations exist, then the statute's meaning is not obvious or self-evident on its face. *Szemple, supra,* 135 *N.J.* at 422, 640 *A.*2d 817; *GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 307, 625 *A.*2d 468 (1993). When a statute is ambiguous, a court's function is to ascertain and to effectuate the Legislature's intent. *Szemple, supra,* 135 *N.J.* at 422, 640 *A.*2d 817 (citing *Cedar Cove, Inc. v. Stanzione,* 122 *N.J.* 202, 213, 584 *A.*2d 784 (1991)). Extrinsic aids, such as legislative history, committee reports, and contemporaneous construction, may be used to help resolve any ambiguity and to ascertain the true intent of the Legislature. *Ibid.*

The legislative history regarding the 1991 amendment includes the Senate Judiciary Committee's Statement that accompanied the proposed amendment. It provides:

"This bill is intended to resolve a potential conflict between N.J.S.A. 3B:5–10 part of New Jersey's Probate Code and the 'New Jersey Parentage Act,' P.L.1983, c. 17 (C. 9:17–38 et seq.) with regard to the standard for the determination of the parentage of children born out of wedlock.

. . . .

The Parentage Act which was enacted in 1983 sets procedures and standards for determining parentage of children born out of wedlock. *These procedures were intended to be applicable in all actions. In order to insure that a determination of parentage under the Parentage Act would also be applicable in probate matters,*

*this bill would amend 3B:5–10 to provide that for purposes of intestate succession the parent-child relationship may be established as provided in the Parentage Act."*

> [290 *N.J.Super.* at 471, 676 *A.2d* 144 (quoting *Senate Judiciary Committee Statement to Senate Bill No. 1346, L.* 1991, *c.* 22 (1990)).]

As noted earlier, the 1991 amendment to *N.J.S.A.* 3B:5–10 was in response to the 1987 report submitted by the Law Revision Commission that emphasized the different burdens of proof for establishing parentage under the Parentage Act and under the Probate Code. The Parentage Act creates rebuttable presumptions of parentage under some circumstances. *N.J.S.A.* 9:17–43(a). In those circumstances, a putative father may overcome that presumption only by clear and convincing evidence. *N.J.S.A.* 9:17–43(b). Absent a designated presumption of parentage, the burden of proof is by a preponderance of the evidence. *N.J.S.A.* 9:17–43(d). In contrast, under the Probate Code prior to the 1991 amendment, a parentage action to prove heirship after the decedent's death required a claimant to establish heirship by clear and convincing proof. *N.J.S.A.* 3B:5–10(b).

What emerges from a review of the legislative history is an intent to change the Probate Code's provision, *N.J.S.A.* 3B:5–10, to create the same burden of proof existing under the Parentage Act. Consistent with that intent, the Senate Committee's Statement reveals that the only articulated purpose of the amendment was to resolve a potential conflict between the Probate Code and the Parentage Act regarding "the standard for the determination of the parentage of children born out of wedlock." *Senate Judiciary Committee Statement to Senate Bill No. 1346—L.* 1991, *c.* 22. The word "standard" most commonly refers to the burden of proof in a cause of action. *See Del Tufo v. Township of Old Bridge,* 147 *N.J.* 90, 98, 685 *A.2d* 1267 (1996) (using term "standard" to refer to burden of proof); *see also SSI Med. Servs., Inc. v. State,* 146 *N.J.* 614, 617, 685 *A.2d* 1 (1996) (same).

That conclusion is supported by the fact that the Commission discussed only the inconsistent burden of proof issue. The Commission recommended changing the burden of proof under the

Probate Code because of the increased reliance on scientific tests under the Parentage Act to establish paternity. Hence, the Commission recommended that the Legislature

> accept the more clear and specific rules for the determination of parent-child relationships of the Parentage Act and its reflection of the modern principle that scientific tests can be used to make an accurate determination of parentage in the majority of cases.
>
> [*Law Revision Commission Report, supra,* at 4–5 (footnote omitted).]

■ We conclude that the Legislature intended the 1991 amendment to *N.J.S.A.* 3B:5–10 to amend *only* the standard of proof. The Legislature was convinced that, given the reliable scientific tests used under the Parentage Act to establish parentage, it no longer made sense to require a higher burden of proof under the Probate Code to establish the identical fact. Consequently, the Legislature's use of the terms "standard for the determination of parentage of children," intended for the word "standard" to have its common meaning, namely, the burden of proof.

-B-

Apart from the legislative history revealing that the 1991 amendment intended to change only the burden of proof for establishing parentage under the Probate Code, the Parentage Act and the Probate Code are independent statutes designed to address different primary rights. The purpose of the Parentage Act is to establish "the legal relationship . . . between a child and the child's natural or adoptive parents, incident to which the law confers or imposes rights, privileges, duties, and obligations." *N.J.S.A.* 9:17–39. Child support is the major concern under the Parentage Act. The purpose of the Probate Code, on the other hand, is to determine the devolution of a decedent's real and personal property. *N.J.S.A.* 3B:1–3. The different purposes the two statutes serve, help to explain why the Legislature contemplated different periods of limitations for filing claims under those statutes.

■ It is well established in New Jersey that parents have a duty to support their children from the date of birth until the children are emancipated, which is presumed to occur upon the age of majority. *Newburgh v. Arrigo*, 88 *N.J.* 529, 543, 443 *A.*2d 1031 (1982). Because the right to support accrues on the date of birth and ends on emancipation, it is fair to apply *N.J.S.A.* 9:17–45(b) to claims for support.

Although plaintiff received financial and emotional support from decedent for many years before his death, decedent's parentage was not established before plaintiff reached her twenty-third birthday as required by *N.J.S.A.* 9:17–45(b). She was not told that decedent was her father until she was thirty-one-years old, at which time she was not in need of his support. Indeed, the law imposed no obligation for him to support her at that time. Consequently, application of the Parentage Act's statute of limitations to any support claim that she might have filed at the age of thirty-one would have been fair because (1) that period balances a claimant's right to support with the State's interest in requiring prompt filing of parentage actions, *see Unif. Parentage Act* § 7, 9B *U.L.A.* 306–07 cmt. (1987); and (2) a parent is relieved of the duty to provide support upon the child's emancipation. *Newburgh, supra*, 88 *N.J.* at 543, 443 *A.*2d 1031.

In contrast to children who file support claims, which accrue on the date of birth, *potential* heirs have no right to share in an estate until the death of the decedent. By definition under the Probate Code, heirs are "those persons . . . who are entitled under the statutes of intestate succession to the property of a decedent." *N.J.S.A.* 3B:1–1. Applying *N.J.S.A.* 9:17–45(b) to actions under the Probate Code would create a statute of repose that commences on the birth of a potential heir, rather than a statute of limitations running from the decedent's death. Indeed, the Parentage Act provides that it does not affect the time within which an heirship claim must be filed. *N.J.S.A.* 9:17–45(f). That section provides further evidence that claims under the Probate Code and Parentage Act are subject to independent limitations periods. To hold otherwise would grant heirship immunity to parents of children

who are born out of wedlock and do not establish parentage before reaching age twenty-three. That would terminate many claims before they accrue. *E.A. Williams, Inc. v. Russo Dev. Corp.*, 82 *N.J.* 160, 167, 411 *A.*2d 697 (1980). To allow that to occur would be contrary to the Legislature's recognition in 1991 that "a person is the child of the person's parents regardless of the marital state of the person's parents." *N.J.S.A.* 3B:5–10.

Furthermore, the purpose of the 1991 amendment was to make it easier, not harder or impossible, for persons born out of wedlock to establish heirship. Before the 1991 amendment, a child's heirship could be established after the death of a parent, regardless of the age of the child. *N.J.S.A.* 3A:2A–41(b)(2) (repealed 1982). Absent some express contrary indication, it is highly unlikely that the Legislature would reduce the limitations period for filing heirship claims. A reduction in the limitations period would indeed be anomalous, given that our society has been moving gradually away from imposing legal disadvantages on children born out of wedlock who bear no responsibility for their parents' "irresponsible liaisons beyond the bonds of marriage." *Weber v. Aetna Cas. & Sur. Co.*, 406 *U.S.* 164, 175, 92 *S.Ct.* 1400, 1406, 31 *L.Ed.*2d 768, 779 (1972). "[P]enalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent." *Id.* at 175, 92 *S.Ct.* at 1407, 31 *L.Ed.*2d at 779. Finally, the comment to the limitations provision of the *Uniform Parentage Act* § 7, 9B *U.L.A.* 306 (1987), is persuasive. That comment states that, "[i]n effect, . . . this Section provides for a twenty-one-year statute of limitations, except that *a late paternity action does not affect laws relating to distribution and closing of decedents' estates or to the determination of heirship." Ibid.* cmt. (emphasis added). Thus, the Uniform Parentage Act was not intended to affect the limitations period for actions to prove heirship. Because our Parentage Act is modeled after the Uniform Parentage Act, and for the other reasons stated, we hold that the Legislature did not intend its 1991 amendment to change the Probate Code's limitation on when claims can be filed thereunder for determination of heirship.

Our holding that the 1991 amendment changes only the standard for proving parentage for heirship purposes should have no effect on estate planning. It is inconceivable that since the amendment, fathers of children born out of wedlock have made their estate planning decisions based on whether post-mortem parentage claims for heirship purposes had to be established by a preponderance of the evidence or by clear and convincing evidence, as was required before the amendment. In the present case, the social opprobrium associated with having a liaison with a married woman is more likely to have influenced decedent not to include plaintiff in his estate planning by publicly acknowledging her as his daughter or by providing for her in a will.

-C-

We also reject the Appellate Division's reasoning that the twenty-three-year period of repose should be imposed in order to guard against spurious claims. 290 *N.J.Super.* at 476–77, 676 *A.*2d 144. The need to prevent fraudulent claims has been "substantially alleviated by recent scientific developments in blood testing dramatically reducing the possibility that a defendant will be falsely accused of being the illegitimate child's father." *Mills v. Habluetzel,* 456 *U.S.* 91, 104 n. 2, 102 *S.Ct.* 1549, 1557 n. 2, 71 *L.Ed.*2d 770, 781 n. 2 (1982) (O'Connor, J., concurring); *see also Pickett v. Brown,* 462 *U.S.* 1, 17, 103 *S.Ct.* 2199, 2208, 76 *L.Ed.*2d 372, 385 (1983) (stating that "the relationship between a statute of limitations and the State's interest in preventing the litigation of stale or fraudulent paternity claims has become more attenuated as scientific advances in blood testing have alleviated the problems of proof surrounding paternity actions"); *State v. Marcus,* 294 *N.J.Super.* 267, 279, 683 *A.*2d 221 (App.Div.1996) (noting general acceptance of DNA analysis by scientific community and courts); *State v. Williams,* 252 *N.J.Super.* 369, 380, 599 *A.*2d 960 (Law Div.1991) (stating that "[i]t is generally accepted that [DNA testing] can limit the spectrum of potential donors of a blood specimen to one out of every 10 million persons").

Another source has noted that

[j]udicial recognition of the scientific acceptance of the foundations of DNA analysis is consistent with our conclusion that the methods of DNA analysis surveyed in this report are firmly grounded in molecular biology. When [DNA] profiling is done with due care, the results are highly reproducible.... [T]here seems little doubt in the courtroom, as in the laboratory, that properly conducted [DNA] profiling is a scientifically acceptable procedure....

[Committee on DNA Forensic Science, National Research Council, *The Evaluation of Forensic DNA Evidence* 176 (1996) (footnote omitted).] [1]

In another decision, the United States Supreme Court noted that "increasingly sophisticated tests for genetic markers permit the exclusion of *over 99%* of those who might be accused of paternity, *regardless of the age of the child.*" *Clark v. Jeter*, 486 *U.S.* 456, 465, 108 *S.Ct.* 1910, 1916, 100 *L.Ed.*2d 465, 474 (1988) (emphasis added). Indeed, in the present case, the Cellmark report has revealed a 99.99% probability of decedent's paternity and a DNA fingerprint match with decedent, the probability of which is one in twenty-three million for unrelated people. In the face of such compelling evidence, few spurious claims will go undetected.

IV

We hold that *N.J.S.A.* 3B:23–19 controls and that the 1991 amendment to *N.J.S.A.* 3B:5–10 did not change the Probate

---

[1] The National Research Council ("NRC") is a private, non-profit society of distinguished scholars that the National Academy of Sciences organized in 1916 at the request of the President. The NRC is now administered by the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. *See Exec. Order No.* 2,859, *as amended by Exec. Order No.* 10,668, 21 Fed.Reg. 3155 (1956), *and Exec. Order No.* 12,832, 58 Fed.Reg. 5905 (1993), *reprinted in* 36 *U.S.C.A.* § 253, at 34–35 (Supp.1997). The NRC formed the Committee on DNA Technology in Forensic Science to study the use of DNA analysis for forensic purposes, which resulted in the issuance of the 1992 NRC report. Subsequently, at the request of the Director of the FBI, the NRC formed a new committee, called the Committee on DNA Forensic Science, to study recent developments in the field, which resulted in the issuance of the 1996 NRC report. Committee on DNA Forensic Science, National Research Council, *Preface to the Evaluation of Forensic DNA Evidence* v-vi (1996).

Code's statute of limitations. That statute allows an out-of-wedlock child of a deceased parent to file an heirship claim with the personal representative of the decedent's estate within the time the court has deemed reasonable for the filing of claims. Here, there can be no dispute over whether plaintiff filed her claim within a reasonable time. Ryan died on February 6, 1995, and plaintiff filed her claim on February 7, 1995.

V

The judgment of the Appellate Division is reversed. The matter is remanded to the Chancery Division, Probate Part to dispose of the complaint on the merits.

*For reversal and remandment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—none.